# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
# (Greenbelt Division)

| | |
|---|---|
| In Re:<br><br>*CPKAP, LLC d/b/a* Kapnos Taverna, *et al.,* [1]<br><br>Debtors. | Chapter: 11<br><br>Case No.: 18-21808 (LLS)<br><br>(Joint Administration Pending) |

**AFFIDAVIT OF MICHAEL ISABELLA IN SUPPORT OF DEBTORS' CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Michael Isabella, of full age, being duly sworn, upon his oath deposes and says:

1.  I am the president and sole shareholder of the corporate debtor, Mike Isabella, Inc., d/b/a Mike Isabella Concepts ("MIC"), and the managing member, either directly or through MIC, of each of the other debtor entities that filed the within Chapter 11 bankruptcy petitions on September 6, 2018 (the "Petition Date"), all of whom are LLC debtors.

2.  I submit this affidavit on behalf of each of the Debtors in connection with their bankruptcy filings. I have personal knowledge of the facts set forth herein.

## I.   BACKGROUND

**A.   Culinary History**

3.  I am a chef and restaurateur. I am either the 100% owner (directly or through MIC), or a managing member (where there are other investors) of each of the Debtors. The Debtors consist of 6 operating restaurants (2 in Maryland, 3 in Virginia [all located at the same

---

[1] The Debtors in these chapter 11 bankruptcy cases and the last four digits of their employment identification numbers are: CPKAP, LLC d/b/a Kapnos Taverna College Park (3742), Mosakap, LLC d/b/a Requin Mosaic (6763), Mike Isabella, Inc. d/b/a MIC, Mike Isabella Concepts (6314), 14WBella, LLC d/b/a Kapnos & G (3035), BallKap, LLC d/b/a Kapnos Taverna (1385), BallCantina, LLC d/b/a Pepita (7545), BallNoodle, LLC d/b/a Yona (2510), Masskap, LLC d/b/a Arroz (2590), and Tyisa, LLC d/b/a Isabella Eatery (4088).

location], and 1 in Washington, D.C.), 2 closed restaurants, and a management company, MIC, that manages the 6 operating Debtors plus 2 additional restaurants: one in Maryland and one in Washington, D.C., both of which are not currently debtors before this Court.

4. My formal training as a chef began at The Restaurant School in New York, where I took classes. But I really learned to cook through my work at various New York City fine dining establishments. Next, I worked in Philadelphia, as a sous chef for James Beard award winner Douglas Rodriguez at Alma de Cuba, and then at a host of other Stephen Starr restaurants. From there, I moved to El Vez, where I learned Latin cuisine under the direction of Chef Jose Garces. Finally, as executive sous chef of Marcus Samuelsson's Washington Square, I learned about opening and running a fine dining establishment from the business side of things.

5. I relocated to Washington, D.C. in 2009, and served as executive chef for José Andrés' "Zaytinya" for 3 years.

6. I worked hard and learned all I could, and 7 years ago, decided that it was time to venture out on my own. I chose Washington, D.C. as my permanent home, and in 2012, we opened Graffiato to critical acclaim. After significant success with Graffiato, investors believed in me (and more importantly in my food as well as my restaurant management abilities), and we opened many new restaurants, one after the other. At its height, the Isabella group of restaurants had grown in just a few short years to more than a dozen restaurants in Washington, D.C., Maryland, and Virginia, with additional outposts at Washington National Airport.

7. Annexed hereto as Exhibit A[2] is an article from the New York Times describing our successes. I'm proud to have won many accolades for the dining experiences I've been able to create with the help of our dedicated employees.

---

[2] https://www.nytimes.com/2017/10/09/dining/mike-isabella-washington-dc-restaurateur.html

2

8. At our highpoint, we employed some 400 people prior to opening the food court at Tyson's Galleria in Fairfax, Virginia in December of 2017.[3] That Tyson's corner venture, "Isabella Eatery", was an unprecedented nine-concept dining experience spanning 41,000 square feet.

9. Our work, positive press, and the other positive accolades[4] I've received over the years began to bear fruit in early 2018 on a scale that I had not imagined. In early 2018, 20 new restaurants and restaurant management deals were under development, including 8 deals in which documents were being negotiated and circulated for signature. These included major stadium and arena deals for opening Isabella Eateries there, several contracts for Las Vegas restaurants, a deal for a restaurant in Houston, Texas, one restaurant in the Middle East, and many, many more. The future looked very, very bright.

10. In the Spring of this year, I reached a settlement of a litigation about which I issued the following statement:

> On behalf of Chloe Caras and Mike Isabella Concepts (MIC), we have reached an agreement to resolve Ms. Caras' claims against MIC. The financial terms of the settlement are confidential. According to Debra Katz, counsel to Ms. Caras, "in settling this case, Ms. Caras met one of her central goals, which was to have MIC enter in a binding agreement obligating it to take corrective measures, including robust training, and to adopt policies to encourage a work environment free of sexual harassment." According to Mike Isabella, "This agreement allows Chloe to focus on her bright future, and allows us to focus on a future in which all of our valued employees will continue to flourish in our management ranks as we remain positive, productive leaders in the

---

[3] The number of employees increased to approximately 800 upon opening at Tyson's Galleria.

[4] In 2012, I was named FOOD & WINE magazine's The People's Best New Chef Mid-Atlantic. I was honored in 2016 by the Restaurant Association of Metropolitan Washington as Restaurateur of the Year. My first cookbook, "Mike Isabella's Crazy Good Italian" was published in 2012. I've served as a judge on "Man vs. Child: Chef Showdown" on FYI. I competed on Season Six of Top Chef, and Top Chef Duels, and I was the runner-up on Top Chef All-Stars. I also have had the honor of being asked by the United States Department of State to join the American Chef Corps, a network of chefs from across the United States who serve as culinary diplomats and resources to the Department of State.

        D.C. restaurant community.  I am happy to personally guarantee that we will strengthen our internal policies and practices and ensure all MIC employees work in a comfortable environment."

**B.**    **Financial Performance in 2018**

11.    For a period of approximately 3 months, *i.e.*, from March 2018 through June of 2018, the Washington, D.C., Maryland and Virginia press reported heavily and repeatedly on the litigation described above and ultimately on the settlement of same.

12.    One by one we lost the 20 new deals in development.  The counterparties to these proposals and draft contracts, in the thick of the press reporting, terminated their discussions with me and/or withdrew their written offers.  Not one of these proposed development deals remains in prospect.

13.    The Debtor, Isabella Eatery at Tyson's Corner ("Tyisa"), our largest, newest and costliest venture, opened in December 2017.  For its first 3 months of operations, revenues had hovered around $1 million/month – an amount which enabled us to break even with our rent and debt obligations and the cost of maintaining 340 employees there.[5]  Following strong months in January and February 2018 (typically our slow season), we anticipated and were excited about continued growth during the spring busy season which would bring that entity to profitability.

14.    Instead, however, following the negative press, revenues at Tyisa plummeted from $1 million/month to $300,000/month, an amount which was simply not sufficient to sustain operations.  Similarly, revenues at our other restaurants, particularly those directly associated with my name and reputation, also sank substantially.  Graffiato was my signature brand and my first restaurant in the D.C. area.  At Graffiato D.C., sales sank from $50,000 per week to $5,000 per week and at Graffiato Richmond, from $30,000 per week to $12,000 per week.  The story at

---

[5] It is not unusual for restaurants to break even or struggle in their first year of operation.

Requin Mosaic was no different. Declining revenues immediately lead to vendor problems and to landlord problems, an inability to pay our lenders, and to the conclusion that four of our restaurants were simply not sustainable. We closed those 4 restaurants as follows:

| NAME | DATE CLOSED |
|---|---|
| MosaKap, LLC "Requin Mosaic" | April 14, 2018 |
| Graffiato RVA, LLC "Graffiato VA" | June 3, 2018 |
| Isabella Bella, LLC "Graffiato DC" | July 21, 2018 |
| Tyisa, LLC "Isabella Eatery" | August 24, 2018 |

15. Two of those closed restaurants, MosaKap, LLC, t/a Requin Mosaic and Tyisa, are debtors herein. The 2 other closed restaurants are not currently debtors insofar as votes from additional equity holders will be required for these entities to seek the protection of the bankruptcy court. We expect to file these entities shortly.

16. Presently, the Debtors operate 6 restaurants and a management company and employ 268 people in operating and managing those restaurants. Another 81 people work for the 2 restaurants we manage that are not debtors herein, making us responsible for 349 jobs at the current time.

17. Many of our restaurant vendors do business with more than one of our separate entities. In some cases, a single trade vendor may separately do business with all of our restaurants. When the closed or closing restaurants suffered these extensive losses and simply did not have the wherewithal to pay their respective trade debt, these vendors tightened trade credit on our remaining successful restaurants, to the point where those restaurants are now suffering on the expense side as well, even though their revenues remain strong. And on the investor side, folks who invested in those restaurants that remained profitable were in many cases also investors in the restaurants that failed. Where I could often count on these investors historically to assist with funds when needed, that source of stop gap or bridge loan revenue has

5

also dried up for those locations that remain otherwise fiscally sound.

18. As a result, the stresses on those restaurants most closely associated with my name has spilled over to our fiscally sound restaurants, also jeopardizing the future livelihood of some 349 employees who work there, the dozen of vendors who supply us, and the investors who funded have us.

19. The industry, to put it simply, is looking for me to restructure, *i.e.*, to make a clean break with the closed restaurants that could not sustain themselves, and to move on to a smaller group of restaurants that I can focus on and reorganize around.  Absent a clear and public restructure, however, those profitable/cash flowing restaurants are also in jeopardy.

20. Therefore, my plan for these Chapter 11 proceedings are to: (i) settle down the excitement in the press that followed the litigation, (ii) focus on normalizing business operations among the cash flowing restaurants; (iii) restore trade terms and investor confidence, (iv) conclude the business of liquidating the closed restaurants, and (v) emerge a smaller, but stronger, group of businesses that can continue to employ their 280 employees, pay their trade creditors on agreed upon terms, restore investor confidence, and move forward.

**C.    Capital Structure**

        *a.    Mike Isabella, Inc.,*

21. The debtor, MIC, is the management company that manages each of the operating restaurants, performing such services as overall creative design and leadership, legal and accounting functions, marketing and advertising, setting menus, and supervising organization and fulfillment of all catering at the various restaurants.

22. As its fee, MIC receives a $3,000/month accounting and administration fee per unit, plus 3% of gross revenues for the restaurants it manages.  It runs at essentially a break even.

It is a co-guarantor on a $400,000 loan from Eagle Bank dated March 4, 2016 and of a $1,250,000 equipment loan from Manufacturers and Traders Trust Company ("M&T") to Tyisa pursuant to a loan agreement dated December 21, 2017.

### b. CPKAP LLC

23. CPKAP LLC owns and operates the Kapnos Taverna in College Park, Maryland. It has no institutional or bank debt, although it is currently the subject of an eviction action by its landlord. This bankruptcy proceeding is being filed in part to effectuate a stay of that eviction proceeding in order to keep the restaurant open, and preserve the jobs and assets of Kapnos Taverna for reorganization before this Court.

### c. 14WBella, LLC

24. 14WBella operates the Kapnos & G restaurants in Washington, DC. It is a co-guarantor of $1.6 million in face amount of four different loans (approximately $400,000 each) in favor of Eagle Bank and made to related Debtors described more fully below. It also guarantees the December 21, 2017 M&T equipment loan made to Debtor Tyisa, LLC in the amount of $1,250,000. 14WBella, LLC also guarantees a $613,000 loan made to MassKap, LLC on December 15, 2016.

### d. BallKap, LLC

25. BallKap, LLC operates the Kapnos Taverna located in Arlington, Virginia. Like 14WBella, it is also a co-guarantor of the $1.6 million in face amount of Eagle Bank loans to related Debtors, as well as the $1,250,000 M&T equipment loan to Tyisa dated December 21, 2017. It also carries its own $400,000 loan from American Express dated May 24, 2018, on which the sum of $256,072 remains due and owing. BallKap also guarantees a $613,000 loan made to MassKap on December 15, 2016 by Eagle Bank.

4032131

   e. *BallCantina, LLC*

  26. BallCantina operates the Pepita restaurant in Arlington Virginia. It is the original borrower on a December 22, 2014 loan from Eagle Bank in the amount of $400,000. It is also a guarantor of the second Eagle Bank loan dated August 10, 2015 in the amount of $400,000. Third, it guarantees the M&T equipment loan in the amount of $1,250,000 made to Tyisa on December 21, 2017. BallCantina also carries its own American Express loan dated December 21, 2017 in the amount of $162,000 on which the sum of $57,779 remains due and owing.

   f. *BallNoodle, LLC*

  27. BallNoodle, LLC operates the Yona noodle bar in Arlington, Virginia. It is a direct borrower under the August 10, 2015 loan from Eagle Bank in the amount of $400,000. It is also a guarantor on the December 21, 2017 M&T equipment loan to Tyisa in the amount of $1,250,000.

   g. *MassKap LLC*

  28. MassKap LLC operates the Arroz restaurant in Washington DC. It carries a loan in the face amount of $200,000 from On Deck Capital. There is currently the sum of $86,874 due and owing on that loan. Masskap is also the primary borrower of a loan from Eagle Bank dated December 15, 2016, in the original principal amount of $613,000. Currently, the sum of $497,486 is outstanding on that loan.

   h. *TYISA, LLC*

  29. Tyisa owned and operated under the "Isabella Eatery" tradename at Tyson's corner in McLean, Virginia. Tyisa is indebted to M&T pursuant to a December 21, 2017 equipment loan agreement in the face amount of $1,250,000 which loan is guaranteed by certain of the other Debtors as described above. The loan is secured by equipment in place at the

Tysons Galleria Mall. The current amount outstanding pursuant to the loan and security agreement is $775,096.

### i.   *MosaKap, LLC*

30. MosaKap, LLC owned and operated the restaurant Requin Mosaic located in Fairfax, Virginia. It is indebted to Eagle Bank pursuant to a certain loan and security agreement dated March 4, 2016 in the face amount of $400,000. The current amount outstanding pursuant to such loan and security agreement is $176,322.

## II.   FIRST DAY MOTIONS

31. To minimize the adverse effects of the commencement of these Chapter 11 cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed or are filing the following First Day Motions:

- Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 102(1) and 105(a) and Bankruptcy rules 2002(m) and 9007 to Establish Noticing Procedures (the "Noticing Procedures Motion");

- Debtors' Emergency Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion");

- Debtors' Emergency Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 507(a)(4)(i) Authorizing But Not Directing the Debtors to Pay Prepetition Wages, Salaries, Commissions, Compensation, Benefits And Reimbursable Business Expenses and Related Costs, and Directing All Banks to Honor Checks for Payment of Employee Obligations (the "Wages Motion");

- Debtors' Emergency Motion Authorizing, But Not Directing, the Debtors to Honor Certain Pre-Petition Obligations to Customers and Continue, Renew, Replace, Modify, Implement or Terminate Customer Programs in the Ordinary Course of Business (the "Customer Programs Motion");

- Debtors' Emergency Motion for Interim and Final Orders (i) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service on Account of Prepetition Invoices, (ii) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to Sections 105(a) and 366 of Title 11 of the United States Code (the "<u>Utility Motion</u>").

A.  **<u>Noticing Procedures Motion</u>**

32.  The Debtors request that the Court grant authority to limit notice and to establish notice procedures in these Chapter 11 cases. In light of the size and complexity of the Debtors' operations and the fact that multiple entities have commenced chapter 11 cases, hundreds of entities would be required to receive notice under certain circumstances pursuant to the Bankruptcy Code, the Bankruptcy Rules, and/or Local Bankruptcy Rules. As in many large chapter 11 cases that are jointly administered, requiring the Debtors to provide multiple Debtor-specific creditor mailing lists would be would be extremely burdensome to the Debtors, costly to their estates, and in many instances unnecessary, as certain motions would have no bearing on certain parties. Accordingly, the Debtors propose to reduce the administrative burden and expense by limiting notice and service requirements.

B.  **<u>Joint Administration Motion</u>**

33.  The Debtors request entry of an order directing the joint administration of their Chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for all of the jointly-administered cases. The Debtors propose to designate the chapter 11 case of CPKAP, LLC d/b/a Kapnos Taverna, as the main bankruptcy case.

C.  **<u>Wages Motion</u>**

34.  The Debtors seek the authority, but not the obligation, to pay prepetition wages, salaries, commissions, compensation, benefits and reimbursable business expenses and other

10

employee-related costs, totaling approximately $308,000 for 268 employees of the Debtors for the period of Monday, August 27, 2018 through Sunday, September 9, 2018, and to continue employee programs with respect to vacation, sick, personal and holiday leave and similar benefit programs (collectively, the "Employee Obligations").  Failure to timely pay the Employee Obligations, and specifically the Wage and Salary Claims that accrued during the immediate prepetition period, will negatively impact the Debtors' operations.  Many employees live paycheck to paycheck and will experience severe personal hardship if there is an interruption in their receipt of paychecks as a result of the chapter 11 filing.  Accordingly, the Debtors request authority to pay these Employee Obligations, and if any prepetition payroll checks are not honored, the Debtors seek authority to issue new checks to pay those dishonored amounts.  The Wage Motion also seeks authority to pay regular expenses associated with payroll including Worker's Comp Insurance, health benefits, any garnishments that may be in place, and other routine items associated with employee wages.

### D. Customer Programs Motion

35. The Debtors seek entry of an order authorizing, but not directing the Debtors to honor certain pre-petition obligations to customers and continue, renew, replace, modify, implement or terminate customer programs in the ordinary course of business, including the Gift Card Program.

36. In the ordinary course of their business and as is customary in the restaurant industry, the Debtors have developed certain policies and programs to target, develop, and sustain a positive reputation for the Debtors' business, to attract new customers to the Debtors' business, and to develop loyalty and sales among the Debtors' existing customers. Specifically, the Debtors issue gift cards in a variety of denominations (both online and in stores), to be used

at any of the Debtors' restaurant locations (the "Gift Card Program").  The Debtors believe that continuing the Gift Card Program is important to maintain their customer base.  As of the Petition Date, the Debtors estimate that the aggregate amount of outstanding gift cards totals approximately $42,291.22.

**E.     Utilities Motion**

37.     The Debtors seek entry of an Order (i) prohibiting the Utility Companies (as defined in the Utilities Motion) from discontinuing, altering, or refusing service to the Debtors on account of prepetition invoices, (ii) deeming utility companies to have adequate assurance of future payment, and (iii) establishing procedures for resolving requests for additional assurance.

38.     In the ordinary course of its businesses, the Debtors incur liabilities to the Utility Companies for electricity, gas, telephone service, internet service, and data services, at an approximate monthly rate of $20,500.  Uninterrupted utility services are essential to the continuation of the Debtors' operations.  The Debtors' operations will be severely impacted if one or more of the Utility Companies refuse or discontinue utility services for even a brief period of time.  Given the nature of the Debtors' business, any interruption of utility services will harm the Debtors' businesses and their ability to maximize the value of their assets in these proceedings.  Thus, it is critical that the utility services provided to the Debtors continue uninterrupted.  The Debtors seek to maintain such services by depositing an amount equal to the Debtors' estimated aggregate cost for 2 weeks of utility service from each respective Utility Company (approximately $10,250) into a single, segregated, newly created, interest bearing account.

39.     With respect to all of the First Day Motions, I have reviewed them, including any exhibits thereto, and incorporate by reference and verify as true each of the factual statements set forth in the First Day Motions.  I believe that the relief requested by the First Day Motions is

necessary to enable to the Debtors to preserve and maximize value and efficiently implement their restructuring efforts with minimal disruption and delay.

*[Signature page to follow]*

4032131

Dated: September 6, 2018         /s/ Michael Isabella         
                                     Michael Isabella

4032131